**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Fort Myers**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Civil Action No. 1:19-cv-08454 |
| : | |
| TODAY'S GROWTH CONSULTANT, INC. : | |
| (dba THE INCOME STORE) : | |
| : | |
| and : | |
| : | |
| KENNETH D. COURTRIGHT, III, : | |
| : | |
| Defendants. : | |
| : | |

| | |
|---|---|
| MELANIE E. DAMIAN, AS RECEIVER OF | ANCILLARY CASE NO. |
| TODAY'S GROWTH CONSULTANT, INC. | |
| (dba THE INCOME STORE), | |
| | |
| Plaintiff, | |
| v. | |
| | |
| WILLIAM COURTRIGHT, and | |
| COURTRIGHT CONSULTING, INC., | |
| | |
| Defendants. | |
| / | |

## COMPLAINT

Melanie E. Damian, the court-appointed receiver ("Plaintiff" or the "Receiver") in the above-captioned enforcement action, files this Complaint stating claims for fraudulent transfers and unjust enrichment against Defendants, William Courtright and Courtright Consulting, Inc. (together, "Defendants"), and aiding and abetting fraud and aiding and abetting breach of fiduciary duty against Defendant William Courtright, and states:

## PROCEDURAL HISTORY

1.     On December 30, 2019, the Court entered a Temporary Restraining Order Freezing Assets and Imposing Other Emergency Relief [ECF No. 20] ("TRO") and an Order Appointing Receiver [ECF No. 19] ("Appointment Order") in this Securities and Exchange Commission ("SEC") enforcement action (the "SEC Action").   The TRO ordered all of the Defendants' assets frozen to preserve the *status quo*.  *See* ECF No. 20 at pp. 6-7.  Further, the TRO ordered the preservation of all Defendants' documents, books and records concerning (1) the allegations of the Complaint, (2) any securities offered for sale by Defendant Today's Growth Consultant, Inc. (dba The Income Store) ("TGC" or the "Receivership Defendant")[1], including, but not limited to Consulting Performance Agreements (each an "Agreement" and collectively, the "Agreements"), (3) any communications with, between, or among either Defendant.  *See* ECF No. 20 at pp. 7-8.

2.     Additionally, TGC and Kenneth D. Courtright, III ("Courtright") were each ordered to provide a sworn accounting to the Court detailing, among other things, each Agreement entered into by TGC, each loan or indebtedness entered into by TGC, all current assets and liabilities, and any transaction of $10,000 or more.  *See* ECF No. 20 at pp. 8-11.

3.     The Receiver's mandate was to take all actions necessary to implement the terms of the TRO by, among other things, taking possession, custody and control of all of Defendants' assets, establishing control of TGC's business, ensuring that Defendants' assets were frozen and preventing their withdrawal or misapplication, obtaining and preserving documents and records pertaining to Defendants' assets, transactions, and business operations, and performing all acts necessary to protect and preserve the Receivership Estate. *See* ECF No. 19 at pp. 2-4.

---

[1] Capitalized terms herein not otherwise defined are given the definition ascribed to such terms in the Court's Orders.

4.      The Receiver analyzed the business operations, including projected and historic income and expenses and determined that without additional investor funds the operations were not sustainable even in the short term. Even with substantial infusion of investor funds, the TGC/Income Store records indicate a loss in 2018 of ($5.7m) and in 2019 of ($7.5m).  Indeed, the payroll expense alone exceeded TGC's website/e-commerce revenue.

5.      The Receiver's review of TGC's books and records confirm the SEC's allegations that new investor funds and loans, and not website revenue, were used to pay the investors/website partners. For example, in 2018 website revenue was under $2 million while the purported website payout to investors was approximately $12.7 million; and, likewise, in 2019 website revenue was under $4 million while the purported website investor payout was $16.5m. In short, TGC's business was a Ponzi scheme orchestrated by Courtright.

6.      On March 2, 2020, this Court entered two separate stipulated preliminary injunction orders titled Order Imposing Preliminary Injunction Freezing Assets and Granting Other Relief [ECF Nos. 55, 56] (collectively, the "PI Orders") against each of the Receivership Defendants, TGC and Courtright, which shall remain in effect until the Court's determination of the merits of the allegations set forth in the SEC's Complaint or further order of the Court.

## THE PARTIES

### The Receiver

7.      Plaintiff, Melanie E. Damian, was appointed by this Court as Receiver.  Plaintiff brings this action in her capacity as Receiver, pursuant to the authority granted by this Court in the TRO, Appointment Order and the Stipulation and each of the PI Orders entered in the SEC Action.

**The Defendants**

8.      At all times material hereto, Defendant William Courtright was a resident of the State of Florida.

9.      The Defendant William Courtright was the Business Development Director of the Income Store and is the brother of Kenneth Courtright. *See* 740 ILCS 160/2 (k).

10.      In his role as the Business Development Director, the Defendant William Courtright was intimately involved in nearly every operation of the Income Store business for in excess of twenty years, including sales and solicitation of investors. The Defendant William Courtright also personally gave presentations to potential investors at conferences and other venues during which he explained TGC's business model and made commitments to potential investors concerning revenue and investment protection.

11.      The Defendant William Courtright received substantial amounts of funds from TGC. The payments that Defendant received are the funds underlying this action that TGC had obtained from the investors (aka "website partners") and creditors it had defrauded in connection with the fraudulent scheme that Courtright perpetrated through TGC.

12.      Defendant Courtright Consulting, Inc. ("Courtright Consulting") was a Florida corporation formed in 2016. At all times material hereto, the founder, owner, and sole director of Defendant, Courtright Consulting was Defendant William Courtright. At all times material hereto, Courtright Consulting received substantial amounts of funds from TGC purportedly in exchange for services that did not provide value to TGC.

## JURISDICTION AND VENUE

13.      This Complaint is brought to accomplish the ends sought and directed by the District Court in the SEC Action, which, among other things, appointed Plaintiff as Receiver and

authorized her to commence actions to recover assets of the Receivership Estate.  This action is related to the claims in the SEC Action, over which this Court has original jurisdiction pursuant to Title 28, United States Code, Section 1331, in that this action forms "part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  Pursuant to the principles of ancillary jurisdiction or supplemental jurisdiction, this Court has supplemental jurisdiction over the claims set forth herein pursuant to Title 28, United States Code, Section 1367(a).  Therefore, this Court has subject matter jurisdiction over this action.

14.     This Court has personal jurisdiction over Defendants because Defendant William Courtright is a resident of the State of Florida and Defendant Courtright Consulting is a business entity formed in Florida and at all material times transacted business in Florida.

15.     Venue is proper in the Middle District of Florida, pursuant to Title 28, United States Code, Sections 754, 1391(b), and 1692, because Defendant William Courtright resides in the this District, Defendant Courtright Consulting is a Florida corporation operated by and through its principal Defendant William Courtright in this District, and this action is brought to accomplish the objectives of the TRO, the Appointment Order, and the PI Orders and is thus ancillary to the Court's exclusive jurisdiction over the Receivership Estate.

**THE RECEIVER'S STANDING
TO BRING THE CLAIMS ASSERTED HEREIN**

16.     The Receiver has standing to bring the claims asserted in this Complaint pursuant to the Court's TRO, Appointment Order, and PI Orders.  The Receiver's mandate was to, *inter alia*, take possession, custody, and control of all Defendants' assets, establish control of TGC's businesses (to the extent they exist and continue to operate), prevent the withdrawal or misapplication of TGC's funds, collect funds due to TGC, obtain documents and records

pertaining to TGC's assets, transactions, and business operations, and perform all acts necessary to preserve the value of the Receivership Estate.  *See* ECF No. 19 at pp. 2-4.

17.     Pursuant to the Appointment Order, the Receiver was directed to "assume and control the operation of Receivership Defendant and shall pursue and preserve all claims or interests of the Receivership Defendant. The Receiver may continue and conduct the business of the Receivership Defendant in such manner, to such extent and for such duration as the Receiver may deem to be necessary or appropriate, if at all."  *See* ECF No. 19, at p. 3.  Included among such claims are fraudulent transfer actions to recover for the benefit of the Estate amounts that TGC fraudulently transferred to third parties.

18.     The Receiver, on behalf of receivership entity TGC, as a "creditor" of TGC as defined in 740 ILCS § 160/1, has standing to bring the fraudulent transfer claims asserted in this Complaint under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS § 160 and common law unjust enrichment claims pled in the alternative.

## **FACTUAL ALLEGATION**S

### **The TGC Fraudulent Scheme**

19.     From at least 2017 through October 2019, TGC and Courtright raised at least $75 million from more than 500 investors who entered into "Consulting Performance Agreements" with TGC (the "Agreements") pursuant to which the investors would provide up-front payments and ongoing payments in the form of advertising and eCommerce revenues to TGC and TGC promised to pay investors a minimum guaranteed rate of return, in perpetuity, on revenues generated by websites that TGC acquires or builds for the investors and then develops, maintains, and hosts.

20.     The Agreements tout TGC's experience and expertise, informing investors that TGC's "growth formulas" with a foundation in page one Google placement as well as a tailored eCommerce strategy would build a bridge to an array of revenue streams for the investor sites.

21.     In particular, under the Agreements, each investor was entitled to a minimum annual guaranteed return (ranging from 13% to 20%), to be paid monthly, even if the website did not generate sufficient revenue to pay the promised monthly payment.

22.     And, TGC represented to the investors that it is in "satisfactory financial condition, solvent, able to pay its bills when due and financially able to perform its contractual duties" and that it is "debt-free . . . with no accounts payable or loans outstanding."

23.     These representations were false and, since at least January 2017, the websites generated approximately $9 million in advertising and product sales revenue but TGC paid at least $30 million to investors, purportedly pursuant to the Agreements.

24.     TGC covered this significant shortfall primarily by using the up-front payments it received from new or repeat investors who entered into the Agreements with TGC, making the business a classic Ponzi scheme.

25.     TGC also obtained loans from distressed lending companies and commingled the loan proceeds with the up-front payments it received from investors, and then used the commingled funds to pay the monthly payments it guaranteed to investors under the Agreements and to repay the loans.

26.     Indeed, the revenue that was generated from all of the websites each month was significantly less than the monthly payment obligations to the investors and certainly was not sufficient to cover both those monthly payments and TGC's monthly overhead expenses.

27.     Pursuant to the Agreements, each investor was required to pay an upfront fee in exchange for a guaranteed percentage of the assigned websites' revenues or minimum amount if the revenues did not reach a certain level.

28.     Based on the Receiver's analysis of TGC's operations and books and records, this business model as implemented by Defendant Courtright was neither feasible nor profitable.

29.     Some investors received the return of their full investments plus additional amounts making them net winners, because they were early investors who received payments over a longer period of time before the commencement of this action, or Defendant Courtright chose to pay them more than the amounts due to them under the Agreements.

30.     But the majority of investors received back significantly less than they had invested or nothing at all because they invested closer in time to commencement of this action, or Defendant Courtright chose not to pay them the amounts due to them under the Agreements making them net losers with a potential claim against the Receivership Estate.

31.     TGC's solicitation of investments from investors makes up the largest segment of its "revenue."  Pursuant to the Profit and Losses accounting from the company's records, in 2019 alone TGC generated "revenue" from investors of approximately $41.5 million and website income of $3,724,809.00.

32.     During that same time period, TGC paid out $16.5 million to investors and operating expenses in the amount of $34,653,706, resulting in a net loss of $7,520,873 for 2019. Prior years reflect a similar discrepancy in revenues generated from investors in comparison with the amounts paid to investors based upon their investments.

33.     Because many of the websites were not generating sufficient revenues for TGC to pay the amounts due to the investors under the Agreements, TGC used upfront fees it obtained

from new investors who signed Agreements with TGC and the proceeds of significant loans it received from lenders to pay the minimum payments due to earlier investors. *See* ECF No. 45.

34.    And the upfront fees from the investors, the revenues from the websites, and the loan proceeds were all comingled into the same TGC bank account.

35.    Therefore, TGC's business depended on the use of new investors' up-front payments (and perhaps loan proceeds) to cover its obligations to earlier investors functioning as a Ponzi scheme. As such, TGC's business was not sustainable.

36.    Likewise, the representations contained in the Agreements entered into by TGC and the investors relating to TGC's financial condition and the use of the investor's funds at paragraph "O" of the Agreement was not supported by TGC's own records. Specifically, the investor's upfront fee was not used as stated in paragraph O of the Agreement "exclusively for the purchase, hosting, maintenance and marketing of the revenue generating website…". And, TGC, for at least the past three years, was not solvent or financially able to pay its bills when due (without the improper use of new investor funds) to meet its contractual obligations.

37.    In addition, despite representations to the contrary, the websites and domains with minor exceptions were in the name of TGC and not the individual investors.

**Preliminary Findings of Fraud Against TGC**

38.    As a result of this fraudulent behavior, the SEC commenced the SEC Action against TGC that resulted in entry of the TRO and PI Orders containing preliminary findings that TGC likely participated in a fraudulent securities scheme.

39.    At all times material hereto, Courtright, as principal and President, controlled and operated TGC as a means to carry out the fraudulent scheme, thereby causing TGC to commit violations of securities laws and rules, in a breach of his fiduciary duties to TGC. TGC was

under the control of Courtright until the appointment of the Receiver and thus unable to seek recovery of the fraudulent transfers prior to that point.

40.     TGC made the transfers at Courtright's direction, as a result of his fraudulent domination, adverse interest in, and control of TGC and as part of his continued breaches of his fiduciary duties to TGC.

**The Insolvency of TGC**

41.     As a result of operating a Ponzi scheme, TGC was insolvent, undercapitalized, and operating at a loss.  During all relevant times, TGC did not have sufficient assets to pay its debts to investors and/or creditors as those debts became due.

42.     Because most investors have not received the return of their investment or all of the amounts due to them under the Agreements, these investors will have significant claims against the Receivership Estate to recover their investments.

**Transfers to Defendants**

43.     From December 19, 2010 to November 4, 2019, TGC made 485 transfers of funds in the total amount of at least $1,741,139.24, to Defendant William Courtright. The Bank Transfers originated from TGC's bank accounts located in Illinois.  *See* Summary of Disbursements to William Courtright, attached hereto as **Exhibit A**.

44.     From February 2, 2016 through November 19, 2019, TGC made approximately 38 transfers of funds in the total amount of at least $525,289.91, to Defendant Courtright Consulting. Many of the Transfers originated from TGC's bank accounts located in Illinois.  *See* Summary of Disbursements to Courtright Consulting, attached hereto as **Exhibit B.**

45.     Collectively, the transfers to the Defendants detailed *supra* and in Exhibits A and B and totaling approximately $2,266,429.15 are hereinafter referred to as the "Transfers."

46.     The funds comprising the Transfers were funds that TGC and/or Courtright fraudulently obtained from investors and/or creditors in the form of investments, fees and/or other payments made in connection with the Agreements.

47.     Defendants received the Transfers without providing reasonably equivalent value to TGC in exchange for those Transfers.

48.     Further, any services that Defendants may have provided to TGC only facilitated and perpetuated the fraud against current investors and recruiting new investors. Thus, Defendants did not provide any reasonably equivalent value or any other benefit to TGC but rather increased the damages suffered by TGC by increasing the amounts owed to investors and creditors which will be reflected in any restitution that TGC will be required to pay.

49.     Moreover, at all material times, Defendant William Courtright received the Transfers from TGC as an insider of TGC who knew or should have known that TGC was being operated as a Ponzi scheme and/or that TGC was making fraudulent misrepresentations to its investors regarding the use of their funds and thus, Defendant did not receive the Transfers in good faith.

50.     When TGC made the Transfers to Defendants, TGC intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay them as they became due.

51.     Thus, TGC had the actual intent to delay, hinder, or defraud investors and creditors, and made the Transfers to delay, hinder, or defraud investors and creditors.

52.     TGC, and thereby the Receivership Estate, have been damaged significantly as a direct and proximate result of the Transfers as alleged above.  Such damages include, but are not

limited to, losses due to the dissipation of investor funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

53.     Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, misappropriated, or lost from TGC as a result of the fraudulent transfers to, and unjust enrichment of, Defendants.

54.     All conditions precedent to the bringing of this action have been performed or satisfied or have occurred.

55.     The Receiver was not appointed to take control of TGC until December 30, 2019, therefore, she could not have discovered the Transfers until that date at the earliest, and she did not even begin to discover some of the Transfers until May 2019.  Accordingly, this action is brought within the pertinent statutory limitations period.  *See* 740 ILCS 160/10.

56.     Because TGC was operated from its headquarters in Minooka, Illinois, the transactions with Defendant were carried out in Illinois, and the Transfers came from bank accounts located in Illinois, Illinois law applies to the claims brought herein.

## CLAIMS FOR RELIEF

### COUNT I

**Violations of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act**
**740 ILCS § 160/5(a)(1)**

57.     Plaintiff repeats, re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 of this Complaint as if fully set forth herein.

58.     This is a claim to avoid and recover a fraudulent transfer pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

59.     Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor;

740 ILCS 160/5(a)(1).

60.     The Receiver acting on behalf, and standing in the shoes, of receivership entity TGC has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Courtright transferred from TGC to investors and/or creditors pursuant to the actual fraud prong of the statute. 740 ILCS 160/5(a)(1).

61.     TGC's Transfers to Defendants were part of a Ponzi scheme, and thus as a matter of law, were made and/or directed by Courtright with actual intent to hinder, delay, or defraud the creditors of TGC.

62.     In particular, as detailed above, Courtright fraudulently, acting through his fraudulent domination, adverse interest in, and control of TGC, caused the transfer of at least $2,266,429.15 in fraudulent transfers to the Defendants with the actual intent to hinder, delay, or defraud TGC's creditors.

63.     At all material times, Defendant William Courtright was an insider of TGC and received the Transfers as compensation and/or commissions for the services that he provided to TGC to perpetuate its fraudulent scheme.

64.     Defendants received the Transfers without providing to TGC reasonably equivalent value in exchange for the Transfers.

65.     Any services that Defendants may have provided to TGC only facilitated and perpetuated the fraud against current investors and recruiting new investors.  Thus, Defendants did not provide any reasonably equivalent value or any other benefit to TGC but rather increased

the damages suffered by TGC by increasing the amounts owed to investors and creditors which will be reflected in any restitution that TGC will be required to pay.

66.     At the time that TGC made the Transfers, Courtright was operating it as a fraudulent scheme and as a Ponzi scheme to the detriment of TGC and its investors and/or creditors, as determined by the Court in the TRO and PI Orders.

67.     TGC made the Transfers in furtherance of that fraudulent scheme and Ponzi scheme.

68.     At the time that TGC made the Transfers, Courtright removed and/or concealed assets of TGC from the reach of its investors and/or creditors.

69.     TGC made the Transfers at Courtright's direction, as a result of his fraudulent domination, adverse interest in, and control of TGC and as part of his continued breaches of his fiduciary duties to TGC.

70.     Thus, TGC had the actual intent to delay, hinder, or defraud creditors, and made the Transfers to delay, hinder, or defraud TGC's creditors.  Consequently, the Transfers were inherently fraudulent pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

71.     Because the Transfers were fraudulent under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act, the Receiver may avoid the Transfers, pursuant to Section 8(a) of the Illinois Uniform Fraudulent Transfer Act.

72.     As a direct and proximate result of TGC's fraudulent Transfers to Defendants, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $2,266,429.15, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant:  (1) determining that the Transfers from TGC to Defendant were fraudulent and avoiding those Transfers; (2) entering a money judgment against Defendant, in the full amount of the Transfers received by Defendant, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; (3) finding Defendant William Courtright jointly and severally liable for the return of the transfers TGC made to Defendant Courtright Consulting; (4) awarding Plaintiff damages, costs, and interest; and (5) granting such other and further relief as may be just and proper.

## COUNT II

### Violations of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act
### 740 ILCS § 160/5(a)(2)

73.     Plaintiff repeats and re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 of this Complaint as if fully set forth herein.

74.     Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (2) without receiving a reasonably equivalent value in exchange for the transfer        or        obligation,        and        the        debtor:
>
> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;
>
>  or
>
>  (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a)(2).

75.     The Receiver acting on behalf, and standing in the shoes, of TGC has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of

fraudulent transfers that TGC made to Defendant pursuant to the constructive fraud prong of the Act. 740 ILCS 160/5(a)(2).

76.     The Transfers to Defendants were made without TGC receiving reasonably equivalent value in exchange for the Transfers or obligations incurred.

77.     Any services that Defendants may have provided to TGC only facilitated and perpetuated the fraud against current investors and recruiting new investors.  Thus, Defendants did not provide any reasonably equivalent value or any other benefit to TGC but rather increased the damages suffered by TGC by increasing the amounts owed to investors and creditors which will be reflected in any restitution that TGC will be required to pay.

78.     Also, the Transfers occurred when TGC's remaining assets were unreasonably small in relation to the business transaction(s) and when TGC intended to incur or believed, or reasonably should have believed, that TGC would incur debts beyond its abilities to pay as they became due.

79.     As a direct and proximate result of TGC's fraudulent Transfers to Defendants, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $2,266,429.15, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant:  (1) determining that the Transfers from TGC to Defendant were fraudulent and avoiding those Transfers; (2) entering a money judgment against Defendant, in the full amount of the Transfers received by Defendant, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers;

(3) finding Defendant William Courtright jointly and severally liable for the return of the transfers TGC made to Defendant Courtright Consulting; (4) awarding Plaintiff damages, costs, and interest; and (5) granting such other and further relief as may be just and proper.

## COUNT III

### (Unjust Enrichment as to the Transfers)

80.     Plaintiff repeats and re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 of this Complaint as if fully set forth herein.

81.     TGC conferred a benefit on Defendants when it made the Transfers to them in the amount of at least $2,266,429.15, all of which were derived from the fraudulent scheme orchestrated by Courtright through TGC.

82.     Defendants had knowledge of the benefit Defendants received from TGC as a result of the Transfers and voluntarily accepted and retained the benefit conferred.

83.     It is inherently unfair and inequitable violating fundamental principles of justice, equity and good conscience that the funds of investors defrauded in TGC's fraudulent scheme are retained by and used to personally benefit Defendants (who knew or should have known of TGC's fraudulent scheme as an insider of TGC), rather than being returned to the Receivership Estate for the benefit of all of the defrauded investors and/or creditors.

84.     As a direct and proximate result of Defendants' retention of at least the $2,266,429.15, that TGC fraudulently transferred to Defendants, the Receivership Estate has been damaged or diminished, and, under the circumstances, equity dictates that Defendants should return the funds received from TGC and turnover any assets they may have acquired with those funds to the Receiver for the benefit of all of the defrauded investors and/or creditors.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant:  (1) determining that the Transfers from TGC to Defendants

were fraudulent and avoiding those Transfers; (2) entering a money judgment against Defendants, in the full amount of the Transfers, up to the full amount of the Transfers received by Defendants, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; (3) finding Defendant William Courtright jointly and severally liable for the return of the transfers TGC made to Defendant Courtright Consulting; (4) awarding Plaintiff damages, costs, and interest; and (5) granting such other and further relief as may be just and proper.

## COUNT IV

### (Aiding and Abetting Fraud as to Defendant William Courtright)

85.     Plaintiff repeats and re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 of this Complaint as if fully set forth herein.

86.     As set forth above, Courtright was operating TGC as a fraudulent scheme and as a Ponzi scheme to the detriment of TGC and its investors and/or creditors, as determined by the Court in the TRO and PI Orders.

87.     In his role as Business Development Director of TGC and through his company Defendant Courtright Consulting, Defendant William Courtright knowingly and substantially assisted Courtright in perpetuating the fraudulent scheme and Ponzi scheme by being intimately involved in nearly every operation of the Income Store business for in excess of twenty years, including sales and solicitation of investors. The Defendant William Courtright also personally gave presentations to potential investors at conferences and other venues during which he explained TGC's business model and made commitments to potential investors concerning revenue and investment protection thereby perpetuating Courtright's fraudulent scheme.

88.     At the time Defendant provided assistance to Courtright, Defendant William Courtright was regularly aware of his role as part of the fraudulent scheme and Ponzi scheme.

89.     As a direct and proximate result of Defendant William Courtright's conduct, TGC sustained damages.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant William Courtright for compensatory damages and/or restitution, interest, costs, and for such further relief as may be just and proper.

## COUNT V

**(Aiding and Abetting Breach of Fiduciary Duty as to Defendant William Courtright)**

90.     Plaintiff repeats and re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 of this Complaint as if fully set forth herein.

91.     As set forth above, Courtright was operating TGC as a fraudulent scheme and as a Ponzi scheme to the detriment of TGC and its investors and/or creditors, as determined by the Court in the TRO and PI Orders.

92.     By defrauding its investors and operating a Ponzi scheme, Courtright breached his fiduciary duty to its investors to safeguard their investments and not use their investment funds for his own personal benefit.

93.     In his role as Business Development Director of TGC and through his company Courtright Consulting, Defendant William Courtright knowingly and substantially assisted Courtright in breaching his fiduciary duty to investors by being intimately involved in nearly every operation of the Income Store business for in excess of twenty years, including sales and solicitation of investors. The Defendant William Courtright also personally gave presentations to potential investors at conferences and other venues during which he explained TGC's business model and made commitments to potential investors concerning revenue and investment protection thereby perpetuating Courtright's fraudulent scheme and enabling his breach of fiduciary duty.

94.     At the time Defendant William Courtright provided assistance to Courtright, Defendant William Courtright was regularly aware of his role as part of the fraudulent scheme and Ponzi scheme.

95.     As a direct and proximate result of Defendant William Courtright's conduct, TGC sustained damages.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant William Courtright for compensatory damages and/or restitution, interest, costs, and for such further relief as may be just and proper.

Dated: December 30, 2020

Respectfully submitted,

By:     */s/ Kenneth Dante Murena*

Kenneth Dante Murena (kmurena@dvllp.com)
Florida Bar No. 147486
Allison J. Leonard (aleonard@dvllp.com)
Florida Bar No. 87061
Damian & Valori LLP
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone:  (305) 371-3960
Facsimile:  (305) 371-3965

*Counsel for Plaintiff Melanie E. Damian,*
*as Receiver*